DEFENDANT'S EXHIBIT



Southern Pine Credit Union
Special Procedures Report

Adding insight...Not just numbers.

USAO_LEHMAN & PAULO_00066375



CPAs for Credit Unions

| CONTENTS |
|---|

ENGAGEMENT ............................................................................................................................................... 3

CREDIT UNION PROFILE ............................................................................................................................. 3

    Demographics .......................................................................................................................................... 3

SUBJECTS INFORMATION .......................................................................................................................... 4

    Leah Lehman ............................................................................................................................................ 4

    Teresa Paulo ............................................................................................................................................. 4

DISCUSSIONS OF FRAUDULENT ACTIVITY ........................................................................................ 4

    Initial Discovery ...................................................................................................................................... 4

    Post Discovery Findings ....................................................................................................................... 5

    Description of Fraudulent Activity Methodology ........................................................................... 6

CONCEALMENT METHODS ....................................................................................................................... 9

INVESTIGATION PROCEDURES ............................................................................................................. 10

LOSS SUMMARY and CONCLUSION ..................................................................................................... 12

APPENDICES .................................................................................................................................................. 13

Adding insight...Not just numbers.

801 W. Cherry Street, Suite 100, Sunbury, OH 43074

phone 866-965-2294 | 740-965-2294 | fax 740-965-1891 | website www.lilliecpa.com

USAO_LEHMAN & PAULO_00066376



CPAs for Credit Unions

Prepared for:

The National Credit Union Administration
as Conservator of Southern Pine Credit Union
5495 Clyattville Lake Park Rd.
Valdosta, GA 31603

## ENGAGEMENT

We were engaged by the National Credit Union Administration ("NCUA"), as conservator for Southern Pine Credit Union ("Southern Pine" or "the Credit Union"), to investigate certain activities and improper actions of the Credit Union's former CEO, Leah Lehman ("Lehman") and the former controller, Teresa Paulo ("Paulo"). The purpose of our investigation was to identify, analyze, and document through the issuance of this report, any transactions or activities performed by Lehman and Paulo, as well as any other employee, which may have resulted in losses to Southern Pine beyond those typically sustained during the ordinary course of business, such as normal credit losses on properly underwritten and approved member loans.

Our report is intended to accompany a Proof of Loss expected to be filed with the Credit Union's fidelity bond carrier, ProSight Specialty Insurance. The final amount of the loss identified by us is **$5,471,518.93**.

## CREDIT UNION PROFILE

### Demographics

Southern Pine is a state-chartered credit union, federally insured by the NCUA. The Credit Union was chartered in Georgia in 1954 to serve the current and retired employees of Packaging Corporation of America and their immediate family members [1]. As of March 31, 2020, assets totaled approximately $46 million with 2,150 members.

Until June 2020, there were five employees at Southern Pine, including a CEO, a Controller, a Loan Manager and two member service representatives. The Credit Union operates from a building adjacent to the Packaging Corporation of America plant in Valdosta, GA.

Due to irregularities identified by the NCUA, the Credit Union was placed into conservatorship on June 11, 2020. At that time, Lehman and Paulo were placed on leave pending the results of an investigation into the irregularities.

The NCUA hired an independent consultant, Kevin Durrance, as Interim CEO to manage the Credit Union during the conservatorship. As of the date of this report, Durrance is still managing the Credit Union's day-to-day operations.

---

[1] Georgia Control Number: J721283; NCUA Charter Number: 67403

USAO_LEHMAN & PAULO_00066377

## SUBJECTS INFORMATION

### Leah Lehman

Lehman had worked for Southern Pine Credit Union for more than 30 years in the capacity of CEO/manager.

### Teresa Paulo

Paulo was hired at the Credit Union in 1986 when she was 22 years old. Most recently, she had the title of Controller.

Both employees had the ability to create and disburse loans in the core data processing system without being detected by any other employees. In addition, they both knew the passwords to the core system for all employees and sometimes performed transactions under other employees' teller profiles.

## DISCUSSIONS OF FRAUDULENT ACTIVITY

### Initial Discovery

In April 2020, the Georgia Department of Banking and Finance (GDBF) received a call from the Credit Union's corporate credit union, Corporate America. Representatives from the corporate were concerned about transactions that were occurring in the Southern Pine accounts maintained at Corporate America. In particular, the Credit Union's transactional account had over drafted by more than $1 million. When Corporate America representatives reached out to the Credit Union, however, Lehman was not available to talk.

The GDBF informed NCUA about their conversations with Corporate America regarding this situation. However, due to travel restrictions in place because of the COVID-19 crisis, neither the GDBF nor NCUA officials were able to perform an onsite contact at the Credit Union. To continue its investigation, NCUA requested and received information directly from Corporate America. In addition, NCUA was able to gain access to information from the core data processing system through the data processing software company, AMI. Using this information, NCUA was able to identify many unusual transactions being performed. In particular, Lehman and Paulo's personal accounts (including their immediate family members' accounts) at the Credit Union had more than $110 million of transactions conducted through them over the past 5 years. As discussed later in this report, many of these unusual transactions were related to the concealment methods used by Lehman and Paulo to mask the millions of dollars they stole from the Credit Union. In addition, NCUA was able to determine that the Credit Union's settlement account with the corporate credit union had more than $150 million of draft clearings over this 5 year period. This is an extraordinary volume of draft activity for a credit union of this size.

NCUA was finally able to obtain clearance to travel and arrived at the Credit Union on June 11, 2020 at which time Lehman and Paulo were placed on administrative leave. Shortly thereafter, we began our investigation into what were believed to be fraudulent activities.

USAO_LEHMAN & PAULO_00066378

## Post Discovery Findings

When NCUA and GDBF arrived at the Credit Union on June 11, 2020 both Lehman and Paulo were confronted about the unusual activities. Paulo acknowledged to the regulators present that the loans appearing to be suspect were indeed fictitious. She also acknowledged to the NCUA representatives to manipulating the Credit Union records at the end of each quarter so as not to raise suspicion in connection with the quarterly 5300 Call Report (a required regulatory report filed by credit unions each quarter and submitted to the NCUA). While Paulo was forthcoming about the activities, Lehman would not cooperate, saying that she first needed to contact an attorney.

### Transfers into Family Member Accounts

It was discovered that many of the proceeds from the identified fictitious loans were ultimately transferred to numerous related family member accounts at the Credit Union. The accounts of interest identified during our investigation include [2], [3]:

| Leah Lehman Accounts | Teresa Paulo Accounts |
| --- | --- |
| Leah & Scott Lehman – Joint acct # 200142 | Teresa & Duke Paulo – Joint acct # 200159 |
| **Scott Lehman – Leah's Husband – "Fictitious" acct # 201565** | **Duke Paulo – Teresa's Husband – "Fictitious" acct # 202305** |
| Dustin Lehman – Leah's Son – acct # 202754 | William L Paulo – Teresa's Son – acct # - 201791 |
| **Dustin Lehman – "Fictitious" acct # 202168** | Will & Teresa Paulo – acct # 202706 |
| Lance Lehman – Leah's Son – acct # 201580/202156 | Dillon Paulo – Teresa's Son – acct # - 202118 |
| Brooke Lehman – Lance's Wife – acct # 202180/202569 | Alana Paulo – Teresa's Daughter – acct # 202523 |
| Trevor Lehman – Leah's Son – acct # 201470 | Sylvia Starling – Teresa's Mother – acct # 200183 |
| Amanda Lehman – Trevor's Wife – acct # 202035 | Tina Starling (Barfield) – Teresa's Sister – acct # 200158 |
| Kaitlyn Lehman – Trevor's Daughter - acct # 201784 | **Nicholas Starling/Barfield– Tina's Son - "Fictitious" acct # 202124** |
| Josh Lehman – Scott's Nephew - acct # 202535 | Kyle Starling – acct # 202245 |
| Kassidy Lehman – Trevor's Daughter – acct # 201785 | Leroy Paulo – Duke's Brother acct # 201864 |
| Peggy Wisenbaker – Leah's Mother – acct # 200091 | Rose Marie Paulo – Duke's Mother – acct # 201759 |
| Herman Gordon – acct # 202605 | Frank Paulo – Duke's Father – acct # 201759 |
| Kim Gordon – acct # 200988 | Dillon & Teresa Paulo – Joint acct # 202118 |
| Randy Griffin – acct #202522 | |
| Tammy Brown Griffin - #202530 | |

---

[2] The bolded accounts in the table represent fictitious accounts established for the purpose of concealing the embezzlement as described in more detail later in the report.

[3] Note: Not all of the accounts listed above received benefits from Paulo and Lehman's embezzlement activities. However, we attempted to identify any accounts related to Paulo and Lehman for investigation purposes to determine whether they may have benefited from Paulo and Lehman's stolen funds.

USAO_LEHMAN & PAULO_00066379

## Description of Fraudulent Activity Methodology

The methods used by Lehman and Paulo to embezzle Credit Union funds were very straightforward. During the time they stole from the Credit Union, they created share secured loans in their own accounts, took advances on auto loans and unsecured lines of credit in their own accounts and ultimately created share secured loans in completely fictitious accounts. Interestingly, they both used different methods to access Credit Union funds at different times throughout their embezzlement. It was clear, however, that Lehman developed the schemes before Paulo started her own embezzlement. Lehman appears to have been the "mastermind" behind the embezzlement, developing the techniques used to steal funds and conceal the theft, which she apparently later taught to Paulo.

### Lehman Methods and Timeline

Despite limited member account statement information, we discovered that Lehman's fraudulent activity arguably began in June 2003. On June 27, 2003, she created a share secured loan in an account with her husband's name (Scott Lehman # 201565), taking an advance of $7,850 and transferring the proceeds into her joint share draft account (Leah & Scott Lehman # 200142). Prior to this time, Scott Lehman's account #201565 only had an inactive regular share account with $5.00 and an auto loan with a balance of approximately $6,000. This auto loan had regular payments being made on it. It is unknown if the share secured loan Lehman created was actually secured by another share account since there were no shares in this account available for security. Her mother had nearly $300,000 in share accounts with the Credit Union so these funds may have been pledged as security for some of the share secured loans she created early on during her scheme. However, it became a moot point as the share secured loan balances created by Lehman would eventually grow to more than an astonishing $4.5 million by June 2020.

Continually over the next 17 years, Lehman used her own joint accounts and the Scott Lehman account (#201565) to take additional loan advances on allegedly share secured loans, signature loans and advances on automobile loans to fund spending in their joint share draft account. Beginning sometime before 2012, she introduced an account in her son's name (Dustin Lehman # 202168) into the scheme. As of December 31, 2012, the account had an inactive regular share account with $1.41 and a share secured loan totaling approximately $75,000. At this time, Dustin was only 22 years old working at a local deli for $6.80/hr. By December 31, 2013, the outstanding loan balances in Dustin's account (#202168) and Scott Lehman's account (#201565) totaled well over $1 million, as partially reflected in the January 2, 2014 advance on the Dustin Lehman account (#202168) of $818,000 used to payoff a portion of these balances (See the first line of the Rebooking Tab in the worksheet at Appendix A).

From January 1, 2014 through June 2020 Lehman continued to take advances on "share secured" loans in both the Dustin Lehman (# 202168) and Scott Lehman (#201565) accounts. We prepared an analysis of these advances to identify the accounts receiving benefit from these fraudulent funds which is included as Appendix A. Lehman took additional advances of nearly $3.5 million before being place on administrative leave in June 2020. In addition to the advances on the Dustin Lehman loans, there were remaining outstanding balance on two share secured loans in the Scott Lehman account totaling $68,968.42 (loan suffix 11 - $32,486.42 and loan suffix 12 - $36,500.00) at the time Lehman and Paulo were out on leave. These are the only two remaining loans in the Scott Lehman account that were not ultimately paid off using proceeds from the Dustin Lehman fictitious loans. Based upon our review of the member statements, there was no activity on the loan suffix 12 since 2012. Loan suffix 11 had no activity for more than 6 years before Lehman began making payments on it with proceeds from fictitious advances in the Dustin Lehman account. Again, our detailed analysis at Appendix A did not go back prior to 2014 because of the difficulty in obtaining useable daily transaction registers.

### Paulo Methods and Timeline

It was apparent in 2003 that Paulo was struggling financially. She was continually taking advances on signature loans and lines of credit from the Credit Union. In 2003, she had an IRA account that appeared to be legitimate with a balance of over $85k. By March 2005, the entire balance had been depleted by regular transfers into her share draft account to fund regular spending activities. Throughout 2003 to 2005, she tried to make regular payments on apparent legitimately approved loans for vehicles, home improvements, recreational vehicles and motorcycles.

USAO_LEHMAN & PAULO_00066380

However, many times the payment came from additional advances on lines of credit and other loan refinancing efforts.

Beginning in 2006, Paulo began transferring money from relatives' accounts (Tina Starling #200158 and William Paulo # 201791) for temporary cash flow needs. Then in May 2007, she created a "share secured" loan for $25,000 primarily used to pay credit card bills and fund regular spending. There were no apparent share balances in her or her family's accounts that could have been used to secure this loan nor any of the future "share secured" loans that were subsequently created.

In October 2011, she began using a fictitious account in her husband's name (Duke Paulo # 202305) with an initial advance on a "share secured" loan for $42,000. The advance was transferred to her joint account and used to cover share drafts written on their account which were clearing.

In July 2014, Paulo began using account #202124-10 in the name of Nicholas Starling/Barfield (her nephew). The account appears to have been legitimately established in December 2008, likely by Nicholas Starling/Barfield. From the account opening until July 2014, there was very limited activity in the account. In fact, the last legitimate transaction conducted through the account (other than the regular posting of dividends) occurred on August 10, 2009. From that date until July 2014, the account was inactive with a balance of approximately $8.00. On July 2, 2014, Paulo performed the first fraudulent transaction using Starling/Barfield's account. She did this by creating a "share secured" loan (suffix 10) and generated an advance of $42,000. By the time she was placed on administrative leave in June 2020, the fictitious advances she had created in this account grew to more than $1,244,000. Our worksheet of Paulo's fictitious advances using the Starlin/Barfield account is included as Appendix B.

## Acceleration of Lehman and Paulo Activities

The majority of our investigation of Lehman and Paulo's fraudulent activities focused on the accounts they began using in 2014 (Dustin Lehman # 202168 and Nicholas Starling/Barfield #202124). Both Lehman and Paulo gained access to the fictitious advances in these accounts directly by transferring the funds into their own accounts or into family member accounts, or indirectly by first depositing the advances into the share account associated with the fictitious loans. The only difference between the two methods (direct vs indirect) was an intermediary step in the flow of the advances. Ultimately, using either method, Lehman and Paulo created the fictitious loan advances and used them for their own personal benefit (to pay for credit card charges, personal expenses and loan payments) as can be seen it their account statements included in Appendix C. Many times, the fictitious loan proceeds were transferred to the share accounts of family members who also used the funds for their personal use. In addition, Lehman and Paulo used fictitious loan proceeds to make payments for family members on legitimately approved loans they had earlier obtained from the Credit Union. The member statements reflecting the benefit the family members received can be seen in the member statements at Appendix C.

As previously mentioned, Paulo primarily used a fictitious account in her husband's name (Duke Paulo #202305) in the earlier stages of her scheme. There very little legitimate activity transacted in this account, so it was easy for Paulo to conduct fraudulent transactions without drawing much attention. She used the account to take advances on fictitious share secured loans and transferred the proceeds to the joint account she maintained with her husband (Duke and Teresa Paulo # 200159). This account was used by the Paulos for normal everyday activity such as paying bills, credit cards, gas, fast food, etc. When she began using the Nicholas Starling/Barfield account in mid-July 2014 to create fictitious loan advances, she initially transferred the proceeds to the Duke Paulo account (#202305). She then transferred the ill-gotten money from this account to her joint account (#200159) where the funds were used for everyday expenses. She used this method until June 2015. Occasionally, she transferred the fictitious loan proceeds to either Nicholas Starling/Barfield's share account associated with the fictitious loans or to her sister's account (Tina Starling #200158) instead of the Duke Paulo account (#202305). After June 2015, nearly every fictitious loan advance was first transferred to Nicholas Starling/Barfield's account then subsequently distributed to Paulo's legitimate accounts or to her relatives' accounts.

USAO_LEHMAN & PAULO_00066381

As stated earlier, Paulo's first fictitious loan advance on Nicholas Starling/Barfield's account was for $42,000 on July 2, 2014. This advance was deposited into the Duke Paulo account (#202305) to cover a $39,000 share draft that she had written on that account on June 30, 2014. Reviewing the daily transactions registers, we were able to determine that on June 30, 2014 Paulo made payments on her own loans, made payments on loans of family members and made deposits into family member share accounts using the share draft written against the Duke Paulo account (#202305). The share draft amount was distributed as follows:

| Account | ID | ID2 | Date | Time | PM or AM | Trn Amt | | Int Amt | Type | Code | Eff Date |
|---------|-----|-----|------|------|----------|---------|---|---------|------|------|----------|
| 20230516 | LWL | am | 6/30/2014 | 10:17:51 AM | | $ | 6,038.19 | $ 27.16 | PAYMENT CK | LPCH | 6/30/2014 |
| 20230515 | LWL | am | 6/30/2014 | 10:17:36 AM | | $ | 27,197.51 | $ 197.51 | PAYMENT CK | LPCH | 6/30/2014 |
| 20230514 | LWL | am | 6/30/2014 | 10:28:07 AM | | $ | 33.71 | $ 10.32 | PAYMENT CK | LPCH | 6/30/2014 |
| 20230500 | LWL | am | 6/30/2014 | 10:28:07 AM | | $ | 218.38 | | CHCK REC | SDCH | 6/30/2014 |
| 20211811 | LWL | am | 6/30/2014 | 10:20:14 AM | | $ | 530.82 | $ 107.04 | PAYMENT CK | LPCH | 6/30/2014 |
| 20179112 | LWL | am | 6/30/2014 | 10:20:14 AM | | $ | 198.95 | $ 58.01 | PAYMENT CK | LPCH | 6/30/2014 |
| 20179110 | LWL | am | 6/30/2014 | 10:20:14 AM | | $ | 65.62 | $ 9.02 | PAYMENT CK | LPCH | 6/30/2014 |
| 20018301 | LWL | am | 6/30/2014 | 10:18:31 AM | | $ | 3,900.00 | | CHECK REC. | SDCH | 6/30/2014 |
| 20018301 | LWL | am | 6/30/2014 | 10:19:49 AM | | $ | 90.00 | | CHECK REC. | SDCH | 6/30/2014 |
| 20015945 | LWL | am | 6/30/2014 | 10:28:07 AM | | $ | 127.40 | $ 20.68 | PAYMENT CK | LPCH | 6/30/2014 |
| 20015942 | LWL | am | 6/30/2014 | 10:28:07 AM | | $ | 89.14 | $ 5.85 | PAYMENT CK | LPCH | 6/30/2014 |
| 20015941 | LWL | am | 6/30/2014 | 10:20:14 AM | | $ | 10.93 | $ 10.93 | PAYMENT CK | LPCH | 6/30/2014 |
| 20015931 | LWL | am | 6/30/2014 | 10:28:07 AM | | $ | 89.27 | $ 10.16 | PAYMENT CK | LPCH | 6/30/2014 |
| 20015928 | LWL | am | 6/30/2014 | 10:20:14 AM | | $ | 118.99 | $ 19.14 | PAYMENT CK | LPCH | 6/30/2014 |
| 20015926 | LWL | am | 6/30/2014 | 10:20:14 AM | | $ | 219.87 | $ 64.18 | PAYMENT CK | LPCH | 6/30/2014 |
| 20015922 | LWL | am | 6/30/2014 | 10:20:14 AM | | $ | 15.31 | $ 14.26 | PAYMENT CK | LPCH | 6/30/2014 |
| 20015916 | LWL | am | 6/30/2014 | 10:20:14 AM | | $ | 55.91 | $ 17.06 | PAYMENT CK | LPCH | 6/30/2014 |
| | | | | | Total | $ | 39,000.00 | | | | |

The accounts receiving benefit from the $39,000 draft included Duke Paulo (#202305), Dillon Paulo (#202118), William Paulo (#201791), Sylvia Starling (#200183) and Teresa and Duke Paulo (#200159)[4].

Interestingly, although Lehman and Paulo used virtually the same methods to embezzle Credit Union funds, they appear to have acted on their own using the fictitious accounts described herein. That is, Paulo's embezzlement was restricted to transactions in the Nicholas Starling/Barfield account while Lehman's theft was isolated to the Dustin Lehman and Scott Lehman accounts. It is clear based on the evolution of the concealment methods described later in this report, that Paulo and Lehman consulted with each other on how to conceal their fraudulent activities as evidenced by the consistent patterns and methods used in an attempt to hide the fictitious loan balances and underlying transactions.

---

[4] Note: The above is an excerpt from a data base we created from daily transaction registers generated by the core data processing system which was used to identify these transactions. See additional description of our investigative process in the "Investigation" section later in this report.

USAO_LEHMAN & PAULO_00066382

## CONCEALMENT METHODS

Lehman and Paulo needed a strategy to keep the fictitious loans from being detected by regulators or auditors. To ensure the loans did not become delinquent and reported on a Delinquent Loan report, they initially used some very rudimentary techniques to advance the due dates on the loans. They would simply create a credit transaction to simulate the payoff of the loan balance. This transaction would then advance the due date on the loans. Immediately following this transaction, they created a debit entry to put the loan back on the account. This debit entry would often include interest accrued on the outstanding loan. In most cases, there was an additional fictitious loan advance made simultaneously with the entries performed to advance the loan due date. For example, on July 24, 2014 the outstanding fictitious loan balance in the Nicholas Starling/Barfield account (used by Paulo) was paid off and then immediately reinstated including $75.94 of interest expense from the original advance date of July 2, 2014 to July 24, 2014. Simultaneously, another fictitious advance of $7,500 was added to the loan. This transaction advanced the loan due date to July 28, 2019, therefore keeping it from appearing on a Delinquent Loan report, even though no payment was ever made. Below is an excerpt from the Nicholas Starling/Barfield account (#202124) which illustrates this concealment technique:

```
ACCOUNT 202124-00
        TYPE  MAIN SHARE NON-TRANSFERABLE
                    DIVIDEND YTD      .04
        PREVIOUS STATEMENT BALANCE                                        9.14
        PERIOD ENDING BALANCE                                             9.14
------------------------------------------------------------------------------
ACCOUNT 202124-10
        TYPE  SHARE ASSG  PAYMENT DUE DATE  07/28/19
        *ANNUAL PERCENTAGE RATE** 3.00**
        DAILY PERIODIC RATE .00008219
        ***INTEREST CHARGE***
        TOTAL INTEREST         92.24        BALANCE SUBJECT TO INTEREST RATE
        TOTAL INTEREST YTD     92.24        AFTER DEBITS/CREDITS EACH DAY
        PREVIOUS STATEMENT BALANCE                                         .00
JUL 02 TRNSFR OUT TO ACCT  ******-30    TSP  42,000.00       .00   42,000.00
JUL 24 CREDIT INT                       KRH        .00     75.94   42,000.00
JUL 24 CREDT PRIN                       KRH  42,000.00       .00         .00
JUL 24 DEBIT PRIN                       KRH  42,075.94       .00   42,075.94
JUL 24 TRNSFR OUT TO ACCT  ******-30    KRH   7,500.00       .00   49,575.94
JUL 28 CREDIT INT                       TSP        .00     16.30   49,575.94
JUL 28 CREDT PRIN                       TSP  49,575.94       .00         .00
JUL 28 DEBIT PRIN                       TSP  49,592.24       .00   49,592.24
JUL 28 TRNSFR OUT TO ACCT  ******-30    KRH   3,000.00       .00   52,592.24
        PERIOD ENDING BALANCE                                       52,592.24
------------------------------------------------------------------------------
```

This method was used to successfully conceal the fictitious loans for some time after the original advances were made. Additionally, when the fictitious advances were relatively small, Lehman and Paulo did not appear to be concerned about the loans being included in the member trial balance and the impact the fictitious loans had on the financial statements at the end of each month. Eventually, however, it became apparent they were concerned about the loans being detected as the outstanding loan balances continued to grow. This required a new technique.

In September 2014, they altered their original concealment method. The new method required reflecting the loan balance as being paid off at the end of each quarter. They began using this method as they apparently became concerned about the possible detection of the artificial growth in the loan portfolio from the fictitious loans on the quarterly Form 5300 Call reports submitted to the NCUA. To accomplish this concealment technique, a draft (or multiple drafts) was written on a share draft account and used to simulate the payoff of the loan balances. When the drafts cleared the following month, a new advance was taken on one of the fictitious loans and transferred to the

USAO_LEHMAN & PAULO_00066383

share draft account on which the draft was clearing, to ensure there were funds available to cover the clearing share draft. Using this technique, they successfully reduced the outstanding loan balances on the fictitious loans at the end of the quarter (or occasionally off-quarter month ends), thereby not drawing attention to the steadily and rapidly increasing fictitious loan balances.

The drafts needed to pay off the loan balances at each quarter end grew to an amount exceeding $5 million. The presentment of these multi-million dollar drafts eventually led to the scheme being identified by the Corporate Credit Union who noticed the overdrawn position in the Credit Union's corporate account.

## INVESTIGATION PROCEDURES

Due to difficulties obtaining information from the Credit Union core data processing system, AMI, we began our detailed analysis of the flow of the fraudulent loan proceeds from 2014 forward. Prior to this date, we utilized member statements to obtain an understanding of the continued financial stress of both Lehman and Paulo, which resulted in their actions to embezzle funds from the Credit Union for their own personal use. We have included the Lehman and Paulo member statements from 2003 to 2020 in Appendix C. A review of these statements shows the financial deterioration of both Lehman and Paulo as they continually found new ways to fuel their spending starting with unsecured loans and share secured loans ultimately evolving into a massive amount of fictitious "share secured" loan advances.

We eventually obtained daily transaction registers from the AMI system. We then combined the daily registers to create a data base of all transactions by month (excluding share draft and ACH posting since none of the flow of embezzled funds were included in these type of transactions). This was done for 2014 – 2020 thereby allowing us to analyze all of the transactions in the fictitious loan accounts (Nicholas Starling/Barfield and Dustin Lehman). The monthly data bases could then be filtered and sorted to help identify the flow of the fictitious advances into Lehman, Paulo and family members' share accounts, or into loan payments. The worksheets we created were used to trace every advance made on the fictitious accounts used by Lehman and Paulo to the ultimate account destination for the funds. In a very limited number of occasions, there were payments made on these fictitious loan balances. There is no apparent reason for these payments. However, our worksheets incorporate these payments as well. Since we were able to trace each loan advance, it appears the ultimate loss to the Credit Union is represented by the outstanding balances in each of the loans used to make fictitious advances (Nicholas Starling/Barfield - #202124, Dustin Lehman - #202168 and Scott Lehman - #201565). **The reported loss to the Credit Union has been reduced by the amount of interest earned and compounded into the outstanding loan balance on each of these two loans, along with infrequent payments made on the loans, to determine a net loss amount for bond recovery purposes.**

The worksheets we created are included as Appendix A (Dustin Lehman and Scott Lehman) and Appendix B (Nicholas Starling/Barfield). Each worksheet includes three tabs. The first tab includes each advance on the loan. For Paulo's advances on the Nicholas Starling/Barfield account, the initial advance occurred on July 2, 2014. For Lehman's advances using the Dustin Lehman account, the initial advance included on our worksheet was on January 2, 2014. It should be noted that the fictitious loan balances at that date were $901,969.78 in the Dustin Lehman account and $361,467.01 in the Scott Lehman account. This meant that as of January 2, 2014, Lehman had already embezzled $1,263,436.79 from the beginning of her scheme which started in 2002. Again, our detailed analysis of the flow of fictitious loan proceeds includes activity from January 2, 2014 to June 2020 due to the difficulty in obtaining daily transaction registers prior to this date. However, by reviewing the member statement histories prior to January 2, 2014 for the fictitious accounts as well as Lehman and Paulo's other accounts, it is clear identical methodologies were employed prior to this date.

The second tab of each worksheet provides a detail of the loans of Lehman, Paulo and family members that were paid using the fictitious loan proceeds. This additional analysis was necessary since often an advance or portions of an advance was used to make payments on up to as many as 18 different loans. This tab merely facilitates the review of the distribution of these advances.

USAO_LEHMAN & PAULO_00066384

The third tab on each worksheet was necessary to illustrate how additional advances were taken by Lehman and Paulo but didn't show as an actual single advance. At the end of many quarterly periods (March, June, September and December), drafts were written on the fictitious accounts and used to simulate the payoff of the loans, typically on the last day of the quarter. Again, this was done to avoid attention to the growing loan balances in the Credit Union's loan portfolio caused by the ever increasing fictitious loan balances. On the first or second day of the month following the quarter-end loan payoffs, the drafts used to make the payoffs would clear the share draft accounts. To avoid a massive overdraft in the account, new advances would be taken on the fictitious loans starting the process over again. However, in most cases, in addition to taking advances on the fictitious loans to cover the share drafts clearing, Lehman and Paulo included additional advances as part of reinstating the loan balances. We have referred to this process as the "Loan Rebooking". In essence, they rebooked or reinstated the original loan balance that had been paid off on the last day of the quarter and added additional advances at the same time. Therefore, the third tab is identified as the "Loan Rebooking" tab. Our analysis on this tab helps identify the additional advances added to the fictitious loans during the reinstatement or rebooking. We found occasions where the Loan Rebooking process occurred at the end of a month in addition to the end of a quarter. This was rare and there is no ready explanation of what this was intended to accomplish.

An example of a Loan Rebooking from the worksheet is shown for a transaction on March 31, 2016 and April 1, 2016. The March 31, 2016 outstanding loan balance on the Nicholas Starling/Barfield account was $288,500 in the share secured loan suffix 10. Paulo wrote a draft on the Nicholas Starling/Barfield account (suffix 30) for $295,000. This draft paid off the $288,500 balance in the fictitious loan. The remaining amount was used for a deposit to Tina Starling's share account suffix 01 ($5,896.81), a loan payment on Tina Starling's loan suffix 18 ($80.57), a deposit into Nicholas Starling/Barfield's share account suffix 00 ($522.62). This transaction effectively paid off the $288,500 loan balance and made deposits and loan payments totaling $6,500 as distributed above. When the $295,000 share draft cleared on April 5, 2016, a new advance was taken on the recently paid off fictitious loan. The advance was for $296,000 and deposited into Nicholas Starling/Barfield's share draft account suffix # 30. This advance covered the $295,000 draft clearing and added an additional $1,000 to the share draft account. This process of Loan Rebooking was used to conceal the fictitious loans at quarter ends as well as to take additional advances, which were then converted for personal use. This tactic was performed by Lehman more than 55 times and by Paulo more than 20 times to conceal the loans and take additional advances as illustrated on the Loan Rebooking tabs of the worksheet.

| Date of Credit/Advance | Credits to 202124/Loan Advances | Loan Account Debited | Date of Fictitious Payment | Fictitious Loan Payments | Loan Accounts Credited | Date of Draft Debit | Draft Debits from 202305-3 | Difference | Additional Loan Advance | Date of Check Received Deposit | Check Received Deposits | Account Credited for Check Deposit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/1/2016 | $ 296,000.00 | 202124-10 | | | | | | | | 3/31/2016 | $ 5,896.81 | 200183-01 |
| | | | | | | | | | | 3/31/2016 | $ 80.57 | 200183-18 |
| | | | 3/31/2016 | $ 288,500.00 | 202124-10 | 4/5/2016 | $ 295,000.00 | 202124-30 | | 3/31/2016 | $ 522.62 | 202124-00 |
| | $ 296,000.00 | | | $ 288,500.00 | | | $ 295,000.00 | $ 7,500.00 | $ 1,000.00 | | $ 6,500.00 | |

We have also included samples of the share drafts created by Paulo using the Nicholas Starling/Barfield account in Appendix D and samples of share drafts created by Lehman on the Scott Lehman account in Appendix XX

USAO_LEHMAN & PAULO_00066385

## LOSS SUMMARY AND CONCLUSION

After an extensive investigation and detailed analysis of Credit Union records, we were able to illustrate how Lehman and Paulo created fictitious loans and used credit union funds for their own personal use and for the benefit of family members.

Using their access and user privileges in the data processing system, they embezzled more than $5.4 million of Credit Union funds. Their rudimentary methods to steal the money and conceal their theft was ultimately uncovered, but not before they spent over $5.4 million of members' money entrusted to them in their positions as management of the Credit Union. These actions required the Credit Union to be placed into conservatorship by the National Credit Union Administration with its future viability as a going concern in jeopardy.

A summary of the losses incurred by Southern Pine Credit Union is summarized in the table below:

Loss Summary:

| Description | Amount |
|---|---|
| Fictitious advances on Nicholas Starling/Barfield loans (reduced by interest added to the loan balance)<br><br>(See Appendix B) | $1,233,201.77 |
| Fictitious advances on Dustin Lehman loans (reduced by interest added to the loan balances)<br><br>(See Appendix A) | $4,169,330.74 |
| Remaining outstanding balances on Scott Lehman loans<br>(See Appendix C) | $68,986.42 |
| Total loss from Paulo and Lehman embezzlement | $5,471,518.93 |

*Lillie & Company LLC*
December 1, 2020

USAO_LEHMAN & PAULO_00066386

# Southern Pine Credit Union Special Procedures Report

## APPENDICES

| Appendix | Document Name | Document(s) Purpose | Type of Document |
|---|---|---|---|
| APPENDIX A | Dustin Lehman Fictitious Advances Worksheet | Traces all advances on Lehman's fictitious loan to ultimate beneficiary | Forensic prepared worksheet in Excel format |
| APPENDIX B | Nicholas Starling/Barfield Fictitious Advances Worksheet | Traces all advances on Starling/Barfield's fictitious loan to ultimate beneficiary | Forensic prepared worksheet in Excel format |
| APPENDIX C | Member Statements | Statements of account for all individuals receiving benefit and for fictitious accounts | Supporting documentation in PDF indexed by individual. From core AMI system |
| APPENDIX D | Drafts from Nicholas Starling/Barfield account 2019 - 2020 | Illustrate a sample of the checks used to pay off fictitious loans at the end of quarters | Supporting documentation in PDF format |
| APPENDIX E | Drafts from Scott Lehman account 2019 - 2020 | Illustrate a sample of the checks used to pay off fictitious loans at the end of quarters/months | Supporting documentation in PDF format |
| APPENDIX F | Drafts from Leah and Scott Lehman account 2019 - 2020 | Illustrate a sample of the checks supporting the spending by the Lehmans of fictitious loan proceeds | Supporting documentation in PDF format |
| APPENDIX G | Drafts from Teresa and Duke Paul account 2019 - 2020 | Illustrate a sample of the checks supporting the spending by the Paulos of fictitious loan proceeds | Supporting documentation in PDF format |

USAO_LEHMAN & PAULO_00066387